Garry L. **SHUFF**, Plaintiff,

v.

**CONSOLIDATED RAIL CORPORATION,**
a corporation, Defendant.

No. 91 C 5326.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 19, 1994.

Memorandum Granting Reconsideration
Oct. 6, 1994.

Scott Carlton Sands, Sands & Associates; Brian L. Crowe, Brian L. Crowe & Associates; Martin J. Healy, Jr., Martin J. Healy, Jr. & Associates; and James Edward Sullivan, James E. Sullivan and Associates, Chicago, IL, for plaintiff.

David R. Schmidt and Peter F. Higgins, Lord, Bissell & Brook, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

GUZMAN, United States Magistrate Judge.

Pending is the motion of Plaintiff Garry L. Shuff ("Shuff") for partial summary judgment. Also pending is the motion of Defendant Consolidated Rail Corp. ("CONRAIL") to reconsider my Memorandum Opinion and Order dated March 30, 1993. For the reasons stated below, Shuff's motion for partial summary judgment is hereby denied. Further, CONRAIL's motion to reconsider is hereby granted.

### BACKGROUND FACTS

The underlying facts of this case were discussed thoroughly in this Magistrate Judge's Memorandum Opinion and Order dated March 30, 1993 on a previous motion for partial summary judgment by CONRAIL against Shuff. Facts relevant specifically to the parties' present motions follow.

CONRAIL is a national railroad corporation operating as a common carrier in interstate commerce.[1] Shuff is a resident of Indiana who had been employed by CONRAIL since 1967.[2] On or about June 6, 1990, Shuff was injured while manually adjusting the coupling mechanism on a railroad car.[3] The mechanism had initially failed to couple

1. Complaint ¶ 2.

2. Shuff Deposition pp. 5, 12–14.

3. Complaint ¶ 5.

automatically on impact.[4] Hence, Shuff proceeded to manually center the drawbars on two cars and open the knuckle on one car in order to facilitate coupling.[5] Shuff experienced sharp pain in his lower back while attempting to manually center the drawbar.[6] It is undisputed that Shuff has suffered and continues to experience back pain.[7] Additionally, Shuff has been under the constant care of physicians ever since the incident.[8]

Shuff alleged that CONRAIL violated the Federal Safety Appliance Act ("FSAA"), 45 U.S.C. § 2, for failing to furnish railroad cars with operative couplers so that the cars would couple automatically on impact.[9] In addition, Shuff alleged that CONRAIL violated the Federal Employer's Liability Act ("FELA") for failing to furnish Shuff with a reasonably safe place to work.[10]

In response, CONRAIL filed a motion for partial summary judgment claiming no violation of the Federal Safety Appliance Act.[11] CONRAIL argued that the mere failure of cars to couple does not establish a *per se* violation of the FSAA.[12] CONRAIL urged this court to follow a recent Third Circuit decision. *Reed v. Philadelphia, Bethlehem and New England R.R. Co.*, 939 F.2d 128, 132 (3rd Cir.1991), *cert. denied,* — U.S. ——, 113 S.Ct. 1584, 123 L.Ed.2d 151 (1993).[13] In *Reed,* the Third Circuit held that unless equipment is defective, a railroad may defend on the basis that the couplers were out of alignment. *Reed,* 939 F.2d at 132. Hence, CONRAIL claimed no violation of the FSAA because the railcars failed to

couple due to misalignment of drawbars, not due to an equipment defect.[14] Therefore, CONRAIL argued that summary judgment as a matter of law should be granted in its favor as to the FSAA claim based on *Reed.*[15]

In the alternative, CONRAIL stated that it was entitled to a special jury instruction that the failure to couple automatically is not a violation of the FSAA unless there is a defect in the coupler itself. *Reed,* 939 F.2d at 132.[16] CONRAIL argued that a jury could conclude that the failure to couple was due solely to a misaligned drawbar, and therefore find no violation of the FSAA.[17]

In response, Shuff argued that *Reed* represents a great departure from existing case law which other circuits have not adopted.[18] Further, Shuff contended that a genuine issue of fact existed as to whether the coupling equipment was defective.[19] Shuff argued CONRAIL's motion for partial summary judgment be denied.

On March 30, 1993, this court denied CONRAIL's motion for partial summary judgment based on its finding that as a matter of law, a railroad may not use misaligned drawbars as a defense to liability for a violation of Section 2 of the Federal Safety Appliance Act. *Shuff v. Consolidated Rail Corp.,* 818 F.Supp. 219, 224 (N.D.Ill.1993).

Shuff now moves for partial summary judgment based on the argument that the failure of two railcars to couple automatically "on any particular occasion" is, by itself, a

4. Complaint ¶ 5.

5. Shuff Deposition pp. 32–42.

6. Shuff Deposition p. 42.

7. Shuff Deposition p. 74.

8. Shuff Deposition pp. 60–80.

9. Complaint ¶ 7.

10. Complaint ¶ 7.

11. CONRAIL's Motion for Partial Summary Judgment ¶ 4.

12. CONRAIL's Motion for Partial Summary Judgment ¶ 3.

13. CONRAIL's Motion for Partial Summary Judgment ¶ 3.

14. CONRAIL's Motion for Partial Summary Judgment ¶ 4.

15. CONRAIL's Motion for Partial Summary Judgment ¶ 5.

16. CONRAIL's Motion for Partial Summary Judgment ¶ 5.

17. CONRAIL Motion for Partial Summary Judgment ¶ 5.

18. Shuff's Response to Motion for Partial Summary Judgment, ¶ 3.

19. Memorandum in Support of Shuff's Response to Motion for Partial Summary Judgment p. 8.

violation of the Federal Safety Appliance Act.[20] Shuff contends that the failure to couple automatically constitutes a "defect," regardless of whether the coupling equipment operated properly in other instances.[21] Because he was injured attempting to align drawbars that were found misaligned following a failed coupling procedure, Shuff argues that CONRAIL is absolutely liable under the FSAA.

In response, CONRAIL has filed a motion to reconsider based upon the Seventh Circuit's recent decision in *Lisek v. Norfolk & Western Ry. Co.,* 30 F.3d 823 (7th Cir.1994).[22] In *Lisek,* the Seventh Circuit held that the existence of a misaligned drawbar does not necessarily trigger absolute liability under the FSAA. *Id.* at 831. Railroads are not absolutely liable where, prior to coupling, workers have failed to straighten drawbars that have become misaligned during normal railyard operations. *Id.* at 830–31.

CONRAIL argues that the drawbars in the instant case became misaligned due to the jarring of railcars as they were moved over a "hump" during normal railyard operations.[23] According to CONRAIL, the proper response to such misalignments is manual alignment of the drawbars to facilitate coupling.[24] CONRAIL argues the failure to couple was caused by a misalignment which was never corrected prior to coupling.[25] Consequently, CONRAIL has asked this court to reconsider its earlier decision and moves for partial summary judgment because there is "no evidence of record" of defective coupling equipment, which would trigger a violation of Section 2 of the Federal

Safety Appliance Act.[26] CONRAIL points out that after the drawbars were eventually aligned, they successfully coupled.[27]

## JURISDICTION

This court has jurisdiction pursuant to 45 U.S.C. § 56 and 28 U.S.C. § 1331.

## DISCUSSION

Before addressing the merits of Shuff's motion for partial summary judgment, this court must address CONRAIL's motion for reconsideration premised upon the Seventh Circuit's recent ruling in *Lisek v. Norfolk & Western Ry. Co.,* 30 F.3d 823 (7th Cir.1994). CONRAIL moves this court to reconsider its Memorandum Opinion dated March 30, 1993, with respect to the effect of misaligned drawbars in an action under Section 2 of the Federal Safety Appliance Act.

Motions for reconsideration are not a matter of routine practice in this jurisdiction. *Settino v. City of Chicago,* 642 F.Supp. 755, 759 (N.D.Ill.1986). Nor are they authorized under the Federal Rule of Civil Procedure. *National Union Fire Ins. Co. of Pittsburgh v. Continental Ill. Corp.,* 116 F.R.D. 252, 253 (N.D.Ill.1987). However, this district has consistently held that such motions are appropriate under rare circumstances such as "a controlling or significant change in the law or facts since the submissions of the issues to the Court." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.* 123 F.R.D. 282, 288 (N.D.Ill.1988). A motion to reconsider may also be appropriate where "the Court has

**20.** Plaintiff's Motion for Partial Summary Judgment ¶ 5.

**21.** Plaintiff's Memorandum in Support of Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment pp. 1–2.

**22.** CONRAIL's Supplemental Memorandum in Support of Defendant's Motion for Reconsideration and in Opposition to Plaintiff's Motion for Partial Summary Judgment p. 1.

**23.** CONRAIL's Supplemental Memorandum in Support of Defendant's Motion for Reconsideration and in Opposition to Plaintiff's Motion for Partial Summary Judgment p. 3.

**24.** CONRAIL's Motion for Reconsideration ¶ 1; CONRAIL's Memorandum in Opposition to

Plaintiff's Motion for Partial Summary Judgment p. 7.

**25.** CONRAIL's Supplemental Memorandum in Support of Defendant's Motion for Reconsideration and in Opposition to Plaintiff's Motion for Partial Summary Judgment pp. 3–4.

**26.** CONRAIL's Supplemental Memorandum in Support of Defendant's Motion for Reconsideration and in Opposition to Plaintiff's Motion for Partial Summary Judgment p. 4.

**27.** CONRAIL's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment p. 2.

patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning, but of apprehension." *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (D.C.Va. 1983). In short, a motion to reconsider will not be granted where "counsel's memorandum has simply rehashed the same arguments advanced in the original briefing and found inadequate by the Court." *Settino*, 642 F.Supp. at 760.

Since this court's original opinion, the Seventh Circuit Court of Appeals decided a factually similar case, *Lisek v. Norfolk & Western Ry. Co.*, 30 F.3d 823. In contrast to this court's holding in *Shuff v. Consolidated Rail Corp.*, 818 F.Supp. 219, 224 (N.D.Ill.1993), the *Lisek* court held that a misaligned drawbar may be a defense to absolute liability under the FSAA. *Lisek*, at 831. Consequently, CONRAIL's motion for reconsideration is granted based upon the reasoning set forth below.

■ Section 2 of the FSAA requires railroads to use cars "equipped with couplers coupling automatically on impact, and which can be uncoupled without the necessity of men going between the ends of the cars." Federal Safety Appliance Act, 45 U.S.C. § 2. This Court's earlier decision was based on the Supreme Court's holding in *O'Donnell v. Elgin, Joliet & Eastern Ry. Co.*, 338 U.S. 384, 390, 70 S.Ct. 200, 203–04, 94 L.Ed. 187 (1949), which held that the FSAA imposes absolute liability on railroads any time two cars fail to couple automatically upon impact.[28] In addition, this court recognized that the failure to open a coupler knuckle, prior to a coupling attempt, is a defense to FSAA liability.[29] However, this court rejected a defense based on misaligned drawbars.[30] Relying on *Clark v. Kentucky & Indiana Terminal R.R.*, 728 F.2d 307, 313 (6th Cir. 1984), *reversed & remanded, Kavorkian v. CSX Transportation, Inc.*, 33 F.3d 570 (6th Cir.1994), this court noted that a drawbar

has a "typical" lateral play of one to one and one-half inches which does not interfere with automatic coupling on newer equipment.[31] Relying on *Clark v. Kentucky & Indiana Terminal R.R.*, 728 F.2d at 313, this court reasoned that the necessity of workers stepping between railcars to reposition misaligned drawbars is a highly dangerous act that defeats the purpose of Section 2 of the FSAA.[32]

However, *Clark*, 728 F.2d at 309, was recently reversed (August 22, 1994) by the Sixth Circuit in *Kavorkian v. CSX Transportation, Inc.*, 33 F.3d 570. The *Kavorkian* court recognized misaligned drawbars as a defense to FSAA liability. *Kavorkian*, at 576. The *Kavorkian* court noted that drawbars should be properly aligned before automatic coupling is ever attempted. *Id.* at 570. The court emphasized that larger railcars require longer drawbars (in contrast to the shorter drawbars used by average-sized railcars) to facilitate movement on curving tracks. *Id.* at 572. The greater the lateral play (or length) of a drawbar, the greater the likelihood that jarring or vibrating during movement will misalign the drawbar. *Id.* Thus, a failure to couple automatically on impact is not necessarily caused by defective equipment. *Id.* at 573. Unsuccessful coupling may result from a worker's failure to ensure the proper alignment of the railcars or the proper opening of a knuckle before the automatic coupling procedure begins. *Id.*

*Kavorkian* also held that the FSAA does not seek to protect workers who must go between stationary railcars to realign drawbars. *Id.* at 575. *Kavorkian* viewed the danger addressed in the FSAA as the danger of workers having to manually couple cars or "having to go between railroad cars [that are] moving together." *Id.*

More importantly, the Seventh Circuit's decision in *Lisek v. Norfolk & Western Ry. Co.*, 30 F.3d 823, affects the issue of liability in the case at bar. In *Lisek*, the plaintiff was

**28.** *Consolidated Rail Corp.*, 818 F.Supp. at 222.

**29.** *Shuff, Id.* (citing *Affolder v. New York, Chicago & St. Louis R.R. Co.*, 339 U.S. 96, 99, 70 S.Ct. 509, 510–11, 94 L.Ed. 683 (1950)).

**30.** *Shuff*, 818 F.Supp. at 223–24.

**31.** *Shuff*, 818 F.Supp. at 223.

**32.** *Shuff, Id.*

injured when he attempted to realign drawbars prior to coupling. *Lisek,* at 825. *Lisek* stressed that the failure to couple automatically, despite proper preparations, is the only element necessary to trigger absolute liability under the FSAA. *Id.* at 828. Hence, the plaintiff does not have to show that the coupler was defective to establish liability. *Id.* at 826. Since the plaintiff in *Lisek* was injured before coupling was ever attempted, the injury could not be attributed to "a failure to couple automatically." *Id.* at 831.

*Lisek* also explained that a railroad may not be liable even if a person is injured after a failure to couple automatically. The court found that "nondefective coupling mechanisms can, through the normal course of railyard operations, become misaligned to an extent that they will not couple without preliminary [manual] realignment." *Id.* at 831. Consequently, the court held:

> ... the normal operation of nondefective automatic coupling equipment ... occasionally requires manual intercar drawbar alignment prior to coupling in order to function. That being so, the mere existence of a misaligned drawbar cannot trigger the railroad's absolute liability in the same way that a failure to couple would.
>
> *Id.*

Finding the rationale of *Clark v. Kentucky & Indiana Terminal R.R.,* 728 F.2d at 312, "compelling," the *Lisek* court distinguished the facts in *Clark. Lisek,* at 826–27, 831. A "typical" coupler, such as the one in *Clark,* has a lateral play of about one to one and one-half inches, which is incorporated into the design of the drawbar in order to facilitate movement of the railcars around curved tracks. That amount of lateral play "does not interfere with ... coupling upon impact." *Lisek,* at 827. In other words, that amount of lateral play does not cause misalignment during normal railyard operations. The *Lisek* court acknowledged that any lateral play in excess of the one or so inches allotted the specific couplers in *Clark* was attributable to worn or "defective" equipment. *Lisek,* at 827.

In contrast, the railcar involved in *Lisek* was a "piggyback," a railcar that is "longer than standard boxcars and [whose design]

therefore require[s] drawbars having one and one-half *feet* of lateral play." *Id.* at 831. Furthermore, neither party disputed the fact that these types of drawbars could become misaligned during ordinary railyard operations and that such misalignment could prevent automatic coupling. *Id.* Most importantly, "normal" misalignment does not constitute a defect. *Id.*

After a discussion of the holdings in *United Transportation Union v. Lewis,* 711 F.2d 233, 251 (D.C.Cir.1983), *Reed v. Philadelphia, Bethlehem & New England R.R. Co.,* 939 F.2d 128, 131–32 (3rd Cir.1991), *Maldonado v. Missouri Pacific Ry. Co.,* 798 F.2d 764, 768 (5th Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987), and *Goedel v. Norfolk & Western Ry. Co.,* 13 F.3d 807, 812 (4th Cir.1994), the *Lisek* court stated:

> Not only do we view the issue of whether or not non-defective equipment can become misaligned as underlying the courts' divergent holdings on this issue, we are convinced that it provides the only reasonable basis for resolving this question. The purpose of section 2 is to require the use of automatic coupling equipment, and a railroad is liable only for violations of the section.
>
> *Lisek,* at 830 (citation omitted).

Having provided drawbars with the requisite lateral play of one and one-half feet (which normally can cause the railcars to misalign), the railroad in *Lisek* depended upon its workers to ensure the alignment of drawbars prior to coupling so that the coupling procedure would function. *Id.* at 825, 831. Since an automatic method of aligning drawbars is not "commonly available," workers must step between stationary cars to align the bars. *Id. Lisek* held that manual alignment, as opposed to manual coupling, does not violate Section 2 of the FSAA. *Id.* at 827–28 (citing *United Transportation Union v. Lewis,* 711 F.2d at 251). The court also concluded, "... the Congress of 1893 certainly could not have meant to require [automatic center-aligning] equipment that is still unavailable 100 years later." *Lisek,* at 831 (citation omitted).

Consequently, *Lisek's* holding extends the defense of opened knuckles, *see Affolder v. New York, Chicago & St. Louis R.R. Co.*, 339 U.S. at 99, 70 S.Ct. at 510–11, to misaligned drawbars in certain instances. *Lisek* at 831, fn. 15. If a railroad shows that the failure to couple automatically resulted from the lack of pre-coupling alignment, then there is no FSAA liability. The court explained:

> ... if *any* misalignment could trigger liability, then requiring that workers attempt coupling [without realignment] even though they know it will fail due to misalignment would only encourage inefficient procedures ... and increase the risks to employee safety.

*Id.* at 829.

The occurrence of an injury directly following a failed coupling procedure constitutes FSAA liability, unless the defendant shows that: the unsuccessful coupling resulted from: 1) the workers' failure to center misaligned drawbars (which "normally" become misaligned), and/or 2) the workers' failure to open a knuckle on one of the drawbars. *See Lisek*, at 831. If the facts show that both the drawbars and the knuckles were properly set prior to the coupling attempt, but that the railcars nevertheless failed to couple, then any post-coupling misalignment must be attributable to defective equipment.

Here, Shuff injured his back while attempting to realign a drawbar after two railcars had failed to couple automatically on impact.[33] And as established by Shuff's own testimony, after the couplers were properly aligned by Shuff, the cars automatically coupled, without incident.[34]

Further, Shuff has failed to rebut CONRAIL's evidence or raise a genuine issue of material fact to support a conclusion that the drawbars became misaligned by anything other than the normal "humping" operation. According to the affidavit of Lauren S. Davis, Manager—Equipment Construction Engineering for the Association of American Rail-

roads, the drawbars involved in the present case were designed to have a lateral movement of between 3.47 and 15.53 inches well under the lateral play found in the *Lisek* piggyback cars. (Davis aff. par. 4). Further, as established by Shuff's own testimony there is no evidence of defective equipment. Thus, it appears that the failed coupling was the result of misalignment from the normal "humping" operations and therefore the purpose of Section 2 of the FSAA, the requirement that railroads use automatic coupling equipment, has not been violated.

Additionally, this court must address CONRAIL's assertion that on the date of Shuff's accident, CONRAIL had available a "drawbar strap," which may be used to adjust misaligned drawbars.[35] CONRAIL implies that Shuff's failure to use a drawbar strap was the cause of his injury.[36] With regard to FSAA liability, the use or lack of use of a drawbar strap is not relevant. Similarly, for the reasons stated above Shuff's motion for partial summary judgment must be denied.

### CONCLUSION

For the reasons listed above, CONRAIL's motion for reconsideration is sustained and its motion for partial summary judgment is granted. Further, Shuff's motion for partial summary judgment is denied.

**SO ORDERED.**

### MEMORANDUM OPINION AND ORDER ON RECONSIDERATION

Pending is the motion of Plaintiff Garry L. Shuff ("Shuff") to reconsider this court's Memorandum Opinion and Order of September 19, 1994. For the reasons listed below this motion is hereby granted.

### BACKGROUND FACTS

The underlying facts of this case were discussed thoroughly in this Magistrate

---

33. Final Pre–Trial Order ¶ A.3.

34. Shuff's Dep., p. 21.

35. CONRAIL's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment p. 3.

36. CONRAIL's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment p. 3.

Judge's Memorandum Opinion and Orders of March 30, 1993 and September 19, 1994. Facts relevant specifically to Shuff's present motion follow. In August of 1993 this court stayed the instant case pending a decision in *Lisek v. Norfolk & Western Ry. Co.*, 30 F.3d 823 which was proceeding before the 7th Circuit Court of Appeals. This stay was premised on Conrail's argument that this court's earlier ruling, that misaligned drawbars constituted a violation of the FSAA, was an incorrect ruling. *Lisek* was argued on January 11, 1994 and decided on July 14, 1994. In *Lisek,* the Seventh Circuit held, for the first time, that a misaligned drawbar may be a defense to absolute liability under the FSAA if the drawbar is operating with normal lateral play. *Lisek,* 30 F.3d 823. In particular, the court stated the following:

The purpose of Section 2 is to require the use of automatic coupling equipment, and a railroad is liable only for violations of the section. It cannot be liable when it utilizes equipment that complies with the statutory mandate and is not defective. As *Lewis* makes clear, "[t]he predicate for liability under section 2 is the failure to provide equipment that functions as the statute commands." 711 F.2d at 251. If it is normal for nondefective automatic couplers to become misaligned as a part of ordinary railyard operation, then it is simply not reasonable to hold that such misalignment amounts to a violation of the Act. As both the uncontested facts of this case and the findings of other courts indicate, no automatic means for aligning drawbars is commonly available at this time. See *supra* n. 2 and accompanying text. We agree with the District Court of Columbia Circuit that the Congress of 1893 certainly could not have meant to require equipment that is still unavailable 100 years later. 711 F.2d at 251 n. 39. As the court explained:

We shrink from accepting a reading of section 2 that would be tantamount to a pronouncement that 99% of all railroad cars violate section 2 and have done so for the entire 90 years the Act has been in effect.

*Id.*

In sum, then, whether a prior attempt at coupling is required to trigger the railroad's absolute liability in a misalignment case depends on whether the *Affolder* defense extends to misalignment, and that, in our view, depends on whether nondefective equipment can become misaligned as part of normal railyard operations. Having come that far, our task becomes quite simple, as it is uncontested for purposes of this case that nondefective coupling mechanisms can, through the normal course of railyard operations, become misaligned to an extent that they will not couple without preliminary realignment. *Clark's* conclusion to the contrary was based on its finding that the normal play of a drawbar is one to one and one-half inches in either direction, which is not enough to preclude automatic coupling. 728 F.2d at 312–13. According to the uncontested facts in our case, however, the car on which Lisek was injured was a "piggyback car", a flat car that is used to provide "trailer on flat car" (TOFC) and "container on flat car" (COFC) service. (R. 41 ¶¶ 10–11, 19–21.) Such cars are longer than standard boxcars and therefore require drawbars having one and one-half feet of lateral play. (*Id.* ¶ 18). Lisek has not disputed the fact that such drawbars can become misaligned to the point of impending coupling during the normal course of railyard operations and that such misalignment does not reflect any defect in the drawbars. (*Id.* ¶ 22, 33, 35–38)

According to the undisputed facts, the normal operation of nondefective automatic coupling equipment (i.e equipment that complies with section 2) occasionally requires manual intercar drawbar alignment prior to coupling in order to function. That being so, the mere existence of a misaligned drawbar cannot trigger the railroad's absolute liability in the same way that a failure to couple would. In light to the absence of a failed coupling attempt, we must *affirm the district court's dismissal* of Lisek's FSAA claim.

*Lisek* at 831.

This court then granted Conrail's motion to reconsider and ordered summary judg-

ment in Conrail's favor on the FSAA claim. Shuff is now asking this court to reconsider this recent ruling. Shuff in support of his motion to reconsider argues for the first time that the defendant has the burden of showing that the misalignment was not caused by equipment failure.

### DISCUSSION

■ At the outset I agree with Mr. Shuff's latter argument that Conrail, who is relying on the affirmative defense of misalignment must produce evidence to show that the misalignment was not due to equipment failure or defect. The *Lisek* court while performing an extensive review of both state and federal case law acknowledged pursuant to *United Transport Union v. Lewis*, 711 F.2d 233 (D.C.Cir.1983) and *Maldonado v. Missouri Pacific Ry. Co.*, 798 F.2d 764 (5th Cir.1986) that the railroad would still have to produce evidence showing that the misalignment was not due to a failure or defect in the equipment. *Id.* at 828. This is so because a failure to couple due to a deficiency in the equipment, i.e. drawbar with more lateral play than is appropriate for normal operation, clearly amounts to a violation of the FSAA. *Maldonado*, 798 F.2d 764, 768 (5th Cir.1986).

■ Shuff's prior argument contends that there is ample evidence to support a conclusion that there was a deficiency in the equipment. Shuff relies on the following testimony to support this statement.

A. I was walking up the track and I come up on one auto carrier with a slued drawbar. It was the first car I come up on and the second car was a standing car. It also—

A. Had a slued drawbar. I had the engineer stretch the track back.

Q. And what do you mean by stretch the track back.

A. Pull the cars that we had a hold of back. And I proceeded to straighten the drawbars.

Q. In what order?

A. I straightened the tank car and then the auto carrier. And the auto carrier moved slightly and then stopped.

Q. You mean the drawbar moved slightly?

A. I'm sorry, the drawbar.

Q. Not the car itself. The drawbar moved slightly?

A. Yes.

Q. And then it stopped?

A. Then it stopped?

Q. And what did you do next?

A. That's when I felt the pain in my back. And then, I went ahead and slid the drawbar into position.[1]

Again, referring to the auto carrier drawbar and the fact that it moved slightly and then stopped:

Q. Got you. Now, you said—you testified earlier that it moved slightly and then it stopped?

A. Yes.

Q. Okay, Now, would you have utilized the same procedure that you got a hold of the knuckle, opened it, and then you're just pulling it from right to left?

A. Yes.

Q. Just like you did with the tank car?

A. Yes.

Q. And how far did you pull it before it stopped?

A. It might have come a foot.

Q. Okay, And did it come to an abrupt, you know—

A. Yes.

Q. —jerking stop

A. Yes.

Q. Like your pulling it and all of a sudden it like locked up? Is that—

A. Yes.

1. Page 19, Line 22 to page 21, Line 11; G.L. Shuff deposition taken December 12, 1991, Exhibit D.

478

Q. Okay. And then, that's when you said you felt pain in your back?

A. Yes.

Q. Where specifically did you feel pain in your back?

A. In the middle of my lower back mainly . . .[2]

Q. Okay. So you tried again, then attempted to adjust the auto carrier drawbar?

A. Yes.

Q. And what happened in the second time?

A. I was able to move it.

Q. Okay, And then, how far did you have to move to get it straight?

A. Probably two-and-a-half feet. They're a lot longer.

Mr. Crowe: He means from the time that it stopped on you.

BY THE WITNESS:

A. Yes, about two and a half feet. They're quite a bit longer."[3]

Q. Okay, What damage did you see?

A. Well, there was a bent carrier arm under the drawbar on the auto carrier. And there was a bent grab iron on the tank. And it also had the angle cock busted on the tank car.[4]

Shuff then concludes that the above is ample evidence to raise a material issue of fact that the coupling equipment was defective. As established by Shuff's own testimony however, the damage that Shuff refers to regarding the bent carrier arm, bent grab iron, and busted angle cock "is post-impact damage."[5] This is evidenced by the following deposition testimony:

Q. Now, do you have any idea or any knowledge of whether there had been an attempt to couple these two cars before you got to them?

A. No, I had no knowledge of that.

Q. Okay. So the circumstance that—

MR. CROWE: No, he means did you see it couple.

THE WITNESS: Oh, I'm sorry.

MR. CROWE: Are you talking about seeing the coupling?

BY MR. SCHMIDT:

Q. Did you see any coupling before you got there?

MR. CROWE: He didn't say did you see. He said do you have any knowledge of it.

BY THE WITNESS:

A. Oh, I knew it tried to couple when it come off that hump, yes.

BY MR. SCHMIDT:

Q. Okay. Had you seen this happen?

A. No, uh-uh

Q. Okay.

A. But I saw the damage there that come from the by-passing.

Q. Okay. What damage did you see?

A. Well, there was a bent carrier arm under the drawbar on the auto carrier. And there was a bent grab iron on the tank car.[6]

Further, Mr. Shuff admits that once the drawbars were aligned and one of the knuckles opened, the equipment worked.[7] Thus, the only evidence in the record from either side which might explain why the coupling failed is found in Mr. Shuff's testimony that he moved the drawbar some three or three and one half feet before it was again aligned properly. This distance is greater than the 15.35 inches of maximum range for which the drawbars were designed.[8] There is there-

2. Page 42, Line 2 to Page 43, Line 2; G.L. Shuff deposition taken December 12, 1991. Exhibit E.

3. page 44, Line 15 to Page 45, Line 4; G.L. Shuff deposition taken December 12, 1991. Exhibit F.

4. Page 27, Line 2 to Page 27, Line 6; G.L. Shuff deposition taken December 12, 1991, Exhibit G.

5. Shuff's dep. pg. 6–27.

6. Shuff's dep. pp. 26–27.

7. Shuff's deposition pgs. 39–40.

8. The affidavit of Lauren S. Davis, Manager–Equipment Construction Engineering for the Association of American Railroads established that the drawbars involved were designed to have a lateral movement of between 3.47 and 15.35 inches.

fore circumstantial evidence that the drawbar equipment may have been in a worn or defective condition which allowed the drawbars to misalign and therefore fail to couple. Admittedly, this evidence does not clearly establish that fault for the failure to couple lies in defective equipment because the misalignment beyond the range of design may have also been caused by the impact.* But the record is silent as to this and, at any rate, the plaintiff does not have this burden. Under the language of *Lisek* and the cases cited therein it is enough for the plaintiff to show a failure to couple. This is the extent of plaintiff's burden. *Lisek*, 30 F.2d 823, 826 (quoting *Affolder v. New York, C. & St. L.R. Co.*, 339 U.S. 96 (at 99) 70 S.Ct. 509, at 510–11, 94 L.Ed. 683 (1950). Once this is accomplished, the burden then is on the defendant to show that the misalignment of the drawbars did not occur because of equipment failure. In this regard the record fails to preclude a material issue of fact. Although the parties agree that the failure to couple was a result of misalignment, the record fails to establish what the cause of the misalignment was. For this reason, Mr. Shuff's motion to reconsider is granted and the defendant's motion for summary judgment is denied.

### CONCLUSION

For the reasons set forth above, Mr. Shuff's motion to reconsider is granted.

**SO ORDERED.**