50

WILLIAM B. ALBIN, Plaintiff-Appellant, v. ILLINOIS CENTRAL RAIL-
ROAD COMPANY, Defendant-Appellee.

Fourth District   No. 4—94—1054

Argued August 15, 1995.—Opinion filed December 21, 1995.—Modified on
denial of rehearing February 6, 1996.

Robert E. Harrington, Jr., Kenneth J. Sophie, Jr. (argued), and Stephen A. Murphy, all of Harrington, Thompson, Acker & Harrington, Ltd., of Chicago, for appellant.

Matthew J. Maddox and William P. Hardy (argued), both of Hinshaw & Culbertson, of Springfield, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Plaintiff William Albin appeals the trial court's denial of his motion for directed verdict, his post-trial motion for a new trial, or, in the alternative, judgment *n.o.v.* We affirm.

Plaintiff, an employee of defendant Illinois Central Gulf Railroad, injured his back in January 1990 while attempting to manually align a coupler on a railroad car. He brought suit against defendant under the Federal Employers' Liability Act (FELA) (45 U.S.C. §§ 51 through 60 (1988)). He alleged his injuries were caused by several acts of negligence by defendant, and by defendant's violation of the Federal Safety Appliance Act (Act) (45 U.S.C. §§ 1 through 16 (1988)).

The trial occurred in June 1994. Plaintiff, a train conductor at the time of his injury, was responsible for coupling railroad cars. The coupler apparatus on either end of a car consists of a knuckle and a drawbar. The knuckle opens and closes and clasps onto the knuckle of an adjacent car. The drawbar connects the knuckle to the frame of the car and has some lateral movement so the train can travel around curves without derailing. The knuckles and drawbars must be centered for a proper coupling to occur.

On January 8, 1990, plaintiff was working with his crew, brakemen Karl Drake and Charlie Davidson and engineer Walter Mack, coupling cars together. Plaintiff communicated with the crew using a two-way radio. Around 10 p.m., the engine was connected to a caboose and three tank cars. The tank car at the end was number 479; tank car 1185 was $2^1/2$ car lengths away. Plaintiff looked at the knuckles on both cars to make sure they were open and straight. He signaled to Mack to move the train ahead at a slow walking speed. When the knuckles came together, the couple failed. The knuckles jammed, which knocked them and the drawbars askew in opposite directions.

Plaintiff told Mack to back the train up one car length. He then manually set the knuckle and drawbar on 1185. To do this, he cradled the coupler in his stomach and arms, bent his knees, and then straightened his knees to lift and push the coupler into alignment. He learned how to do this by observing other employees because defendant never provided any training or standard procedure for, or equipment to, help with realigning a drawbar. Plaintiff then went to 479 to realign its knuckle and drawbar using the same procedure. As he did so, he felt a sharp pain in his lower back. He let go of the coupler and radioed for a time-out. After resting briefly, he pulled on a lever to open the knuckle and felt the pain again. He radioed he

thought he broke his back and lay down. Drake and Davidson completed his duties that evening, but plaintiff stayed with the crew. When they returned to the yard, he called Rondeau DuFrane, the yardmaster, to report his injury and then went to the hospital.

The track in that location is not level. The north rail is lower than the south rail because a joint between the rails is low. This has been caused by the pulverization of the rock foundation under the rail and joint because of the repeated traveling of traincars over them. Also, a ditch on the north side of the track frequently filled with water, which would turn the ground underneath the north rail to mud and rot the railroad ties. The coupling failed because 1185 was leaning more to the north than was 479, so the knuckles were not properly aligned.

Plaintiff admitted after the coupling failed, he did not radio Mack this had occurred. After he aligned the drawbars, the cars coupled on the second attempt, during which the cars were in the same position at the same track location, and the track conditions were identical. On the accident report he filed, he did not mention uneven tracks or a low joint. It would be "ill-advised" to get between cars that are six feet apart or less while they are connected to a running engine, and he would not do this. He admitted he wrote a letter to defendant saying his job requires very little physical effort. On a safety exam given by defendant, he answered correctly regarding the proper method of manually lifting an object. He could not say for certain a low joint existed where the coupling failed.

John Loberg repaired and supervised the repair of railroad cars for several railroad companies between 1953 and 1992. He reviewed several depositions, including plaintiff's. He believed the coupling failed because the low joint caused the tracks to not be level, thereby causing one of the cars to lean and the knuckles to be misaligned. The joint would have to be three inches low to cause the coupling to fail. Other railroads use three tools to realign a misaligned drawbar: a pry bar, a coupler aligning strap, and a "knuckle mate." The bar provides leverage to move the drawbars without standing between the cars. The strap is placed around the knuckles of each car, and then the strap's tension is increased by the engine pulling on the cars until the knuckles are aligned. The knuckle mate is similar to the strap. Loberg admitted he did not know where the low joint was in relation to where the coupling was attempted, or how low the joint was. His opinion assumed plaintiff aligned the drawbars correctly the first time. He did not find any safety rules broken and had no opinion whether there was any defective equipment. Using either the strap or the knuckle mate requires an employee to stand between the cars when they are four or less feet apart.

Drake, a brakeman on plaintiff's crew, heard plaintiff call for a time-out over the radio because he had injured his back while moving a drawbar. He did not hear Mack, the engineer, say anything. The track in that area slants to the north. The standard procedure of defendant is to have workers manually align drawbars. Defendant has never issued any safety rules on aligning drawbars, nor provided equipment for doing so. He had been a co-worker and friend of plaintiff for 17 years.

Charles Davidson, another brakeman on plaintiff's crew, heard plaintiff call for an injury time-out. He went to plaintiff, who said he had been injured trying to move the drawbar. Davidson tried to move the drawbar, but could not. The track in that area had some low joints and leaned. Defendant never instructed how to realign a drawbar, nor did it provide any tools to assist in doing so. Prior to plaintiff's injury, he did not hear plaintiff discuss over the radio that he needed to move a drawbar.

After testimony regarding damages, plaintiff moved for a directed verdict, which was denied. Andrew Spurlock, a mechanical engineer, testified for the defense. He worked for Burlington Northern Railroad for 16 years performing repairs on components of railroad cars, including couplers. He examined several depositions, including plaintiff's. He believed the couplers involved in plaintiff's injury were not aligned properly. This was because the second attempt at coupling under identical conditions was successful, which indicated there was nothing defective with the track or the couplers. Also, a track uneven enough to cause a coupling to fail would cause frequent and severe derailments. He was not aware of any derailments on the section of track where plaintiff's injury occurred. There was no industry standard for realignment of a drawbar or use of a pry bar and it was common practice to realign them manually without using tools. The use of a coupling strap or knuckle mate would violate the standard safety practice to maintain at least one car length of distance between cars connected to a running engine when an employee is required to stand between them. Also, although a coupler weighs approximately 435 pounds, only between 50 and 75 pounds of pressure are required to move it.

Mack, the engineer on plaintiff's crew, heard plaintiff say over the radio he needed to align a drawbar. He could not say for certain, but he believed plaintiff said this before the first coupling attempt. Sometime after the coupling, plaintiff mentioned he thought he strained his back aligning the drawbar.

Rondeau DuFrane, a yardmaster for defendant since 1987, supervised all yard activities and employees. Although he could not

say for certain, he could not recall any employees informing him of bad track conditions in the area where plaintiff's injury occurred. Defendant had provided safety training programs for its employees, including instruction on coupling cars and general lifting. Defendant has safety rules and they are enforced.

Thomas Pendergrast, a risk manager and former claims manager of defendant, was in charge of railroad safety for his region. During the 1980's, each regional supervisor was sent various videotapes and training manuals, as well as occasional programs with an instructor provided. One program, Operation Fullback, taught employees how to properly lift and how to care for their backs on and off the job. One of the videotapes in the program included the safe method of coupling, including the realignment of drawbars. A letter from defendant to plaintiff informed him of his successful completion of a safety program, which included the proper care to avoid back injuries. Also, Pendergrast took a statement from plaintiff within a day or two after his injury, but plaintiff at no time said the coupling failed because one of the cars was leaning.

At the close of testimony, plaintiff again moved for a directed verdict. The motion was denied. In closing argument, plaintiff asked for damages totaling $1.47 million. The jury found in favor of defendant on all counts. Plaintiff filed a post-trial motion for new trial, directed verdict, or, in the alternative, judgment *n.o.v.*, which was denied. Plaintiff appeals.

■■ Plaintiff first argues the trial court erred in failing to grant him a directed verdict because defendant improperly was allowed to assert the misaligned drawbar defense to liability under section 2 of the Act (45 U.S.C. § 2 (1988) (as amended, see 49 U.S.C.A. § 20302(a)(1)(A) (West Supp. 1995) (eff. July 5, 1994))). Section 2 of the Act required railroad cars be "equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." (45 U.S.C. § 2 (1988).) Although the Act does not itself create a private right of action, employees who allege they have been injured as a result of a violation of the Act may bring suit under the FELA. (*Lisek v. Norfolk & Western Ry. Co.* (7th Cir. 1994), 30 F.3d 823, 825, *cert. denied* (1995), 513 U.S. 1112, 130 L. Ed. 2d 787, 115 S. Ct. 904.) The FELA makes railroads liable for injury to their employees when such injury results, "in whole or in part," from the negligence of the railroad. (45 U.S.C. § 51 (1988).) In State courts, review of jury verdicts arising under the FELA is to be made in accordance with Federal law. *Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, 199-202, 142 N.E.2d 104, 114-15.

■ In *Affolder v. New York, Chicago & St. Louis R.R. Co.* (1950), 339 U.S. 96, 94 L. Ed. 683, 70 S. Ct. 509, the United States Supreme Court applied section 2 of the Act. There, the plaintiff was injured when two cars failed to couple on impact. The defendant asserted the cars failed to couple because either the drawbars were misaligned or the knuckles were closed. The Supreme Court declared a failure of equipment to perform as required by the Act is in itself an actionable wrong without regard to negligence. However:

> "Of course this assumes that the coupler was placed in a position to operate on impact. Thus, if 'the failure of these two cars to couple on impact was because the coupler on the Pennsylvania car had not been properly opened,' the railroad had a good defense. *** [T]he sole question with regard to this issue was whether, *after the couplers were placed in open or proper position,* they failed to couple automatically on impact." (Emphasis added.) (*Affolder,* 339 U.S. at 99, 94 L. Ed. at 688, 70 S. Ct. at 511.)

After *Affolder,* two Federal circuits distinguished misaligned drawbars from closed knuckles, disallowing the misaligned drawbar defense. (*Metcalfe v. Atchison, Topeka & Santa Fe Ry. Co.* (10th Cir. 1974), 491 F.2d 892; *Clark v. Kentucky & Indiana Terminal R.R.* (6th Cir. 1984), 728 F.2d 307.) Recently, however, several Federal circuits have allowed the defense.

*United Transportation Union v. Lewis* (D.C. Cir. 1983), 711 F.2d 233, although not involving the misaligned drawbar defense, examined the Act's legislative history. The Act was enacted in response to thousands of deaths and injuries caused when railworkers were required to stand between moving railroad cars to couple or uncouple the cars. *Lewis* determined Congress intended to prohibit equipment, *not* procedures, in the Act. Otherwise, lawful coupling would be impossible because since the Act was enacted until today, air brake hoses must be coupled by men going between the cars, and it was the Act itself which required railroad cars be equipped with air brakes. (*Lewis,* 711 F.2d at 245.) The third circuit, in *Reed v. Philadelphia, Bethlehem & New England R.R. Co.* (3d Cir. 1991), 939 F.2d 128, considered *Affolder* in light of *Lewis* and concluded the rationale of *Affolder,* which allows a defense of closed knuckles, applies equally to a situation where nondefective equipment is *misaligned* because of human error or natural jarring of the train, rather than by defective equipment. (*Reed,* 939 F.2d at 132.) *Reed* noted the cause of the misalignment is a question for the jury. The fourth circuit later agreed with *Reed,* and expressly disagreed with the tenth circuit's decision in *Metcalfe,* noting that decision "ignore[s] the practical requirement that drawbars move laterally so that trains may move

smoothly without derailing." (*Goedel v. Norfolk & Western Ry. Co.* (4th Cir. 1994), 13 F.3d 807, 812.) The seventh circuit in turn agreed with *Reed* and *Goedel*, declaring because it is normal for nondefective automatic couplers to become misaligned as part of ordinary railroad operations, and because no automatic means of aligning drawbars exists, it is not reasonable to hold such misalignment amounts to a violation of the Act. "[T]he Congress of 1893 certainly could not have meant to require equipment that is still unavailable 100 years later." (*Lisek*, 30 F.3d at 831.) Most recently, the sixth circuit agreed, its analysis may be viewed as reversing its decision in *Clark* to the extent it disallowed the misaligned drawbar defense. (*Kavorkian v. CSX Transportation, Inc.* (6th Cir. 1994), 33 F.3d 570, 573-75.) *Kavorkian* also noted the danger in aligning misaligned drawbars is not the danger against which the Act seeks to safeguard: workers going between *moving* railroad cars. This leaves only the tenth circuit, in a 20-year-old decision, disallowing the defense.

Notwithstanding the Federal case law we are commanded to follow, plaintiff urges us to agree with the majority of cases in State jurisdictions, as well as two appellate districts in Illinois (*Hiles v. Norfolk & Western Ry. Co.* (1994), 268 Ill. App. 3d 561, 644 N.E.2d 508; *Leveck v. Consolidated R. Corp.* (1986), 148 Ill. App. 3d 118, 498 N.E.2d 529), that have disallowed the misaligned drawbar defense. However, most of these cases were decided prior to the recent Federal cases discussed above, and notwithstanding these cases, we are bound by Illinois Supreme Court precedent.

In *Donnelly v. Pennsylvania R.R. Co.* (1952), 412 Ill. 115, 116, 105 N.E.2d 730, 731, the defendant railroad appealed a jury verdict against it after one of its workers was injured attempting to open knuckles and align a drawbar after a failed coupling. The defendant argued the burden should have been on the plaintiff to show the knuckles and drawbars were properly set prior to the failed coupling attempt. After examining *Affolder*, the Supreme Court of Illinois concluded the burden is not on the plaintiff to show proper alignment, but instead, "proof that the couplers *or drawbars* were not in proper position *would constitute a good defense,* but whether the *defendant* had proved this defense was a question of fact for the jury." (Emphasis added.) (*Donnelly*, 412 Ill. at 120-21, 105 N.E.2d at 733.) *Donnelly* reveals the Supreme Court of Illinois recognized the misaligned drawbar defense is valid and it is the defendant's burden to show that misalignment. In short, controlling precedent requires us to recognize the misaligned drawbar defense.

Plaintiff then argues, assuming the misaligned drawbar defense is legally recognized, the trial court erred in failing to grant

him either a directed verdict or judgment *n.o.v.* A motion for directed verdict or judgment *n.o.v.* will not be sustained unless all of the evidence so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Thacker v. UNR Industries, Inc.* (1992), 151 Ill. 2d 343, 353, 603 N.E.2d 449, 454.) On review of a motion for a directed verdict or judgment *n.o.v.*, all of the evidence must be viewed in a light most favorable to the nonmoving party. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) Under the FELA, a plaintiff need not prove common law proximate causation, but only that his injury resulted "in whole or in part" from a violation of the FELA. *Crane v. Cedar Rapids & Iowa City Ry. Co.* (1969), 395 U.S. 164, 166, 23 L. Ed. 2d 176, 180, 89 S. Ct. 1706, 1708.

■ In arguing a directed verdict should have been granted, plaintiff argues the evidence in a light favorable to him. However, when the evidence is viewed in the proper light, *i.e.*, most favorable to the nonmovant (*defendant*), the evidence was sufficient for a trial court to deny a motion for directed verdict and for a rational trier of fact to find in favor of defendant.

The jury could have found plaintiff was injured after the first coupling attempt, but the coupling failed because of a nondefective misaligned drawbar. Plaintiff's expert witness, Loberg, admitted he did not know where a low joint was in relation to where the failed coupling occurred, he had no opinion whether there was any defective equipment, and he *assumed* the drawbars were properly aligned prior to the first coupling attempt. Defendant's expert witness, Spurlock, concluded because the cars coupled under identical conditions on the second attempt, there was nothing defective with the couplers or the track, and instead the drawbars must have been misaligned prior to the first coupling attempt. From this testimony, the jury was entitled to conclude defendant had met its burden of showing the drawbars had been misaligned prior to coupling, and this misalignment was not due to a defect. "Unquestionably, it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony." *Maple v. Gustafson* (1992), 151 Ill. 2d 445, 452, 603 N.E.2d 508, 511-12.

Plaintiff argues the fact the coupler coupled on the second attempt is insufficient as a matter of law to meet defendant's burden of showing there was no defect in the couplers. However, plaintiff misunderstands when a successful coupling is relevant. "[I]f *the coupler was properly set* and failed to couple on the occasion in question," then "[t]he fact that the coupler functioned properly on other

occasions is immaterial." (Emphasis added.) (*Carter v. Atlanta & St. Andrews Bay Ry. Co.* (1949), 338 U.S. 430, 434, 94 L. Ed. 236, 241, 70 S. Ct. 226, 229.) Thus, a coupler violates the Act, irrespective of the negligence of the railroad or the condition of the coupler, if that coupler fails even once during its life *when properly set.* Evidence the coupler functioned properly on other occasions does not excuse a violation *once the violation is proved,* and so is immaterial in this regard. However, evidence the coupler functioned on other occasions *is* admissible if relevant to the issue whether a violation occurred as claimed. Thus, such evidence is admissible on the issues involving the misaligned drawbar defense: whether the coupler was misaligned prior to the coupling attempt and whether that misalignment was caused by a defect. (See, *e.g., Texas & New Orleans R.R. Co. v. Underhill* (5th Cir. 1956), 234 F.2d 620, 623 (evidence coupler coupled under identical conditions is admissible to show coupler was misaligned prior to first coupling attempt).) From plaintiff's admission the cars coupled under identical conditions immediately *after* his injury, the jury was entitled to infer the drawbars were misaligned prior to the first coupling attempt and this was not caused by a defect.

■ Plaintiff next argues there was insufficient evidence to sustain the jury's verdict the railroad was not negligent under the FELA. We disagree. The jury's verdict is supported by the evidence in the record. In regard to poor track conditions, plaintiff admitted he did not know precisely where the low joint was in relation to where the failed coupling occurred. Also, on the accident report he made immediately after his injury, he did not mention either an uneven track or a low joint. Drake testified the track was uneven where the failed coupling occurred, but again, he admitted he had been a friend of plaintiff for 17 years, indicating possible bias. Davidson testified the track had low joints and leaned in the area of the failed coupling, but he did not say how low the joint was. Loberg admitted he did not know where the low joint existed in relation to where the failed coupling occurred, and he did not know how low the joint was. DuFrane could not recall any employee ever reporting bad track conditions in the area where plaintiff's injury occurred. Pendergrast took a statement from plaintiff shortly after his injury, but plaintiff did not mention the coupling failed because of an uneven track. Spurlock stated a track uneven enough to cause a coupling to fail also would cause severe and frequent derailings, but he was not aware of any derailings in the area where the plaintiff's injury occurred. From this testimony, the jury could have concluded either there was nothing deficient about the track, or if there was, the track's condition in no way contributed to plaintiff's injury.

In regard to safety training, plaintiff admitted he was trained, and passed testing, on the proper method of lifting. Drake admitted defendant offered safety programs which he had taken. DuFrane testified defendant has safety rules and training in regard to lifting, and the rules are enforced. Pendergrast testified defendant provided numerous safety courses which plaintiff attended and successfully completed, including instruction on the proper method of lifting, including aligning a drawbar. From this testimony, the jury could have concluded defendant's safety programs, rules, and the enforcement of those rules were in no way deficient regarding the alignment of drawbars.

In regard to the provision of tools to assist in aligning a drawbar, Loberg admitted two tools, the coupling strap and knuckle mate, would require an employee to stand between the cars when they were $4^1/2$ feet apart *or less* and hooked to a running engine. This testimony came just after plaintiff stated it was so dangerous to step in between railroad cars under these circumstances, he would not do it. Spurlock agreed this would be dangerous and it is a standard safety practice to avoid stepping between cars in that situation. Thus, the use of either a coupling strap or knuckle mate would violate this safety practice. Also, there was no industry standard on the use of pry bars, and it was common practice in the industry to manually align drawbars by hand. Both Spurlock and Loberg estimated the force necessary to align a drawbar was much less than its actual weight, and plaintiff admitted he told defendant his job did not require much physical effort. This evidence contradicted any assertion a tool should have been provided to help in aligning a drawbar because of its weight. From this testimony, the jury could have found defendant was in no way negligent for failing to provide tools to align a drawbar.

■ Next, plaintiff argues the trial court erred in failing to grant him a new trial on his claims under the Act and the FELA. The trial court's decision whether to grant a motion for new trial will not be reversed on appeal unless the trial court abused its discretion. (*Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513.) We need not repeat the testimony previously discussed. The trial court did not abuse its discretion in denying plaintiff's motion for new trial.

■ Finally, plaintiff argues a new trial is warranted because of what he contends is the newly discovered evidence defense witness DuFrane committed perjury at trial. To support a motion for new trial, newly discovered evidence must meet five requirements: (1) it must appear to be of such conclusive character that it will probably change the result if a new trial is granted; (2) it must have been

discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; and (5) it must not be merely cumulative to the evidence offered on the trial. (*Loitz v. Remington Arms Co.* (1988), 177 Ill. App. 3d 1034, 1049, 532 N.E.2d 1091, 1100, *aff'd in relevant part & rev'd in part* (1990), 138 Ill. 2d 404, 563 N.E.2d 397.) Plaintiff correctly notes where perjured testimony so permeates the judicial process as to constitute a fraud upon the court, false testimony by a material witness may alone be sufficient to warrant a new trial. *Herington v. Smith* (1985), 138 Ill. App. 3d 28, 485 N.E.2d 500.

During direct examination, DuFrane testified he worked at the Champaign yard since 1987. On cross-examination, DuFrane testified he "believe[d]" he began working at Champaign in 1987. He could not recall whether he was "maybe" temporarily transferred to Effingham and Mattoon on occasions between 1987 and 1989, but otherwise he worked continuously at the Champaign yard. On redirect, DuFrane responded yes to the question whether he worked "in or around the Champaign yard on a regular basis in 1988 and 1989." On re-cross, plaintiff's counsel attempted to impeach DuFrane with testimony he gave in a previous case (Norton v. Illinois Central R.R. (C.D. Ill.), No. 92—CF—1302 (settled March 24, 1995)), in which he had stated he left the Champaign yard in December 1988. DuFrane responded it was possible he gave that testimony because he was not certain whether he left the Champaign yard in 1987 or 1988. Plaintiff asserts DuFrane perjured himself when he represented he worked on or around the Champaign yard on a regular basis during 1988 and 1989. Plaintiff cites two affidavits provided by former employees of defendant and attached to plaintiff's post-trial motion. The employees state DuFrane did not work in Champaign from November 8, 1988, through "the latter part of 1989." Plaintiff also provides DuFrane's testimony in the Norton case, in which DuFrane testified he worked at Mattoon and Effingham until August 1989, at which time he transferred to Champaign. Prior to the transfer, he worked an average of four straight weeks per year, plus an additional average of one day per week, in Champaign. The trial court denied plaintiff's motion for new trial on this basis, impliedly finding there was no fraud upon the court. The trial court was justified in this conclusion.

DuFrane's testimony at both trials can be read as consistent. Plaintiff concedes DuFrane's testimony in the Norton case was accurate and consistent with the affidavits. If this is so, then through 1988 and up to August 1989, DuFrane worked in Champaign an average of four full weeks per year, as well as an average of one additional day per week. DuFrane reasonably could have believed this

constituted "continuous" work on a "regular basis" at the Champaign yard. Moreover, DuFrane repeatedly stressed his uncertainty about his testimony. At worst, his testimony was equivocal. Newly discovered evidence which serves only to impeach or discredit a witness does not constitute grounds for a new trial. (*Flynn v. Edmonds* (1992), 236 Ill. App. 3d 770, 788, 602 N.E.2d 880, 891.) Regardless, assuming DuFrane committed perjury, a new trial is unwarranted.

First, DuFrane's testimony was not of such conclusive character it would probably change the result if a new trial is granted. DuFrane's testimony was so equivocal the jury already was put on notice his testimony was less than fully reliable. Also, plaintiff does not dispute DuFrane worked for defendant for many years prior to plaintiff's injury, and worked full-time at the Champaign yard during the five months immediately preceding plaintiff's injury. Thus, even were a new trial granted, DuFrane would no doubt repeat the same testimony regarding defendant's safety programs and track conditions. Second, DuFrane's inconsistency, if any, with his testimony in the Norton case was already discovered when he testified. On cross-examination, plaintiff's counsel attempted to impeach DuFrane with his testimony in the Norton case. Plaintiff cannot assert he was not aware of DuFrane's testimony in the Norton case. Third, whether and to what extent DuFrane worked at the Champaign yard prior to August 1989 is not material to the issue of the track conditions in the yard in January 1990 when plaintiff's injury occurred, *five months* after DuFrane began working full-time at the Champaign yard.

■ Finally, plaintiff contends DuFrane's trial testimony regarding track conditions surprised him because during discovery, defendant did not list DuFrane in its answers to interrogatories as a person with knowledge of track conditions at the yard. However, plaintiff failed to object to the testimony at trial, and did not move for a continuance to obtain rebuttal evidence. Instead, he elected to proceed with cross-examination and the rest of the trial. On appeal, plaintiff cannot now claim surprise. A failure to object at trial waives the issue on appeal. *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.* (1994), 163 Ill. 2d 498, 502, 645 N.E.2d 896, 898.

The trial court's denial of plaintiff's post-trial motion is upheld. The jury's verdict is affirmed.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.